

EXHIBIT A

# PAVAN PARIKH
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

```
ELECTRONICALLY FILED
May 3, 2023 11:05 AM
     PAVAN PARIKH
   Clerk of Courts
 Hamilton County, Ohio
CONFIRMATION 1315884
```

**LISA ANDERSON**  **A 2301850**

**vs.**

**PROLINK STAFFING SERVICES LLC**

**FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND**

**PAGES FILED: 15**

EFR200

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| LISA ANDERSON <br> 3633 Wabash Ave. <br> Cincinnati, OH 45207 <br><br> Plaintiff, <br><br> v. <br><br> PROLINK STAFFING SERVICES, LLC <br> 4600 Montgomery Rd., Ste. 300 <br> Cincinnati, OH 45212 <br><br> **Serve also:** <br> PROLINK STAFFING <br> SERVICES, LLC c/o FBT Ohio, <br> Inc. (Stat. Agent) <br> 3300 Great American Tower <br> 301 East Fourth St. <br> Cincinnati, OH 45212 <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. <br><br> JUDGE: <br><br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **(JURY DEMAND ENDORSED HEREIN)** |

Plaintiff Lisa Anderson by and through undersigned counsel, as her Complaint against the Defendant, states and avers the following:

**PARTIES**

1. Anderson is a resident of the city of Cincinnati, Hamilton County, Ohio.

2. Defendant PROLINK STAFFING SERVICES, LLC ("ProLink") is a domestic limited liability corporation that conducts business throughout the state of Ohio.

3. ProLink is, and was at all times hereinafter mentioned, Anderson's employer within the meaning of Title VII of the Civil Rights Act of 1964 ("Title VII") and Ohio R.C. §4112, et seq.

4. Within 300 days of the adverse employment actions described herein, Anderson dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Ohio Civil Rights Commission ("OCRC") against ProLink, Charge No. 473-2022-00997 ("EEOC Charge").

5. On or about February 14, 2023, the EEOC issued and mailed a Notice of Right to Sue letter to Anderson regarding her EEOC Charge.

6. Anderson received the Notice of Right to Sue letter from the EEOC in accordance with 42 U.S.C. § 200e-5(f)(1), which had been attached hereto as Plaintiff's Exhibit 1.

7. Anderson has filed this Complaint on or before the 90-day deadline set forth in the Notice of Right to Sue letter.

8. Anderson has properly exhausted all administrative remedies pursuant to 29 C.R.F. § 1614.407(b).

## JURISDICTION & VENUE

9. All of the material events alleged in this Complaint occurred in or around Hamilton County, Ohio.

10. Therefore, personal jurisdiction is proper over Defendant pursuant to R.C. § 2307.382(A)(1) and/or (3).

11. Venue is proper pursuant to Civ. R. 3(C)(1), (3), and/or (6).

12. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

## FACTS

13. Anderson is a former employee of ProLink.

14. At all times noted herein, Anderson was qualified for her position with ProLink.

2

15. At all times noted herein, Anderson could fully perform the essential functions of her job, with or without a reasonable accommodation.

16. Anderson worked for ProLink as a vendor management system ("VMS") specialist from September 22, 2021, until ProLink unlawfully terminated Anderson's employment on or about January 20, 2022.

17. Anderson is African American, placing her in a protected class for her race. Defendant had notice of Anderson's protected class.

18. Anderson started at ProLink full-time after initially beginning as a temporary worker in or around April 2021.

19. Anderson was recruited by recruiter Kristina Nutini (Caucasian) and interviewed by billing supervisor Bryan Pough (Caucasian), billing manager Bryan LNU (Race Unknown), VMS CashApp manager Deanna McCoy (Caucasian), and VMS CashApp manager Tim Donahue (Caucasian).

20. Unfortunately, Anderson experienced discrimination at ProLink even during her time as a temp.

    a. As an example, in or around June 2021, team lead Tamara Cochran-Wong (Caucasian) made a comment to Anderson and direct specialist Donna Ray (African American) that they should not be forming a "Black girl clique" at work.

    b. Anderson and Ray were not doing so, and simply talking to your coworkers is certainly not the equivalent of forming a clique.

    c. Cochran-Wong did not make similar comments to the Caucasian workers at ProLink.

3

21. Through her time as a temporary worker, Anderson picked up a substantial amount of overtime to complete her work and was pleased to be helping ProLink catch up.

22. Anderson worked well with her colleagues and was eventually moved to the VMS side of work shortly before her full-time hire.

23. Anderson was working under Donahue after that point and worked closely with VMS specialist Lauren LNU (Caucasian).

24. Cochran-Wong seemingly had issues with Anderson, though Anderson never understood why.

    a. As an example, during a meeting in or around August 2021, Anderson asked a question about performing her job.

    b. Cochran-Wong began aggressively berating and denigrating Anderson in front of her colleagues despite that it was a good question.

    c. Those attending the meeting witnessed this unprovoked outburst, and Anderson reported it to Donahue as discrimination.

    d. Nothing came of this protected complaint, and Donahue's employment was terminated only a few weeks later.

25. In or around September 2021, shortly before her full-time hire, Anderson met again with Cochran-Wong.

26. At the time, Anderson was working primarily with McCoy.

27. While this meeting was not a formal interview as Anderson had already been doing the job well for months, Cochran-Wong did say that she was concerned about the "gossip" and "negativity" coming from Anderson and Ray – the two African American employees.

28. Cochran-Wong also said that Anderson needed to be more "articulate" and organized.

4

29. African American people not being considered not "articulate" is a common discriminatory stereotype. Anderson is entirely understandable and perfectly articulate.

30. Further, Anderson worked from home, so she did not understand how Cochran-Wong might accuse her of being unorganized when Cochran-Wong never saw Anderson's workspace.

31. Finally, Cochran-Wong also said she felt it was obvious that Anderson did not understand her job, even though Anderson had been doing it for months, McCoy was happy with her work, and he agreed that she was perfectly articulate.

32. Anderson denied these accusations, realizing they were call-backs to Cochran-Wong's previous "Black girl clique" comment and were part of a pattern of continued discrimination against her.

33. Anderson reported Cochran-Wong's comments to controller Jacquelyn Maxwell (Caucasian) – another protected complaint.

34. Maxwell did not understand Cochran-Wong's comments but mostly slid the issue under the rug.

35. Upon information and belief, Cochran-Wong's discriminatory comments against Anderson were never reprimanded or even investigated.

36. Regardless, Cochran-Wong's constant nit-picking continued through the remainder of Anderson's employment.

37. In or around September 2021, ProLink hired Tammy LNU (Caucasian) to replace the previous director.

38. In or around early October 2021, ProLink hired Lori McGahee (Caucasian) to replace Donahue as VMS specialist manager.

5

39. Anderson was one of the first to introduce herself to McGahee, who seemed oddly standoffish in their first meeting.
40. In or around early December 2021, Anderson inherited the account that Lauren LNU had previously worked on.
41. The project was given to Anderson on the same day it was due, and she was given a short rundown of it.
42. This was not enough training to perform the work, so Anderson spoke further with McGahee and Tammy LNU to figure out how to do the work.
43. McGahee and Tammy LNU refused to give Anderson any additional training and told her to get to work.
44. Anderson did her best and completed the work.
45. Unfortunately, after, Anderson learned that the billing rates she was given were wrong for the project.
46. This was not Anderson's fault, but McGahee placed the blame on her anyway.
47. As time went on, McGahee continued to dismiss Anderson whenever she came to her with problems and concerns.
48. Shortly after New Year's Day, Anderson put in a request for time off on January 14 and May 17-22, 2022.
49. McGahee approved the January time off but did not respond at all to the time in May.
50. Anderson asked why the later time was not approved, and McGahee said that "[they] weren't there yet."
51. Later the same day, Anderson had a question and sent a message to McGahee asking for help.

6

52. Several hours later, McGahee video-called Anderson and demanded to know what Anderson wanted.

53. Anderson let McGahee know that she had already found the information she needed, so she did not need anything further at that time.

54. McGahee, seemingly quite annoyed, told Anderson to "think" before reaching out to her.

55. Anderson responded that McGahee had specifically instructed her previously to reach out before she made decisions on tasks and that she was doing exactly as instructed.

56. McGahee said that, eventually, Anderson would have to stop asking questions.

57. Tired of the continuous criticism and discrimination from McGahee, Anderson reported the issue to Tammy LNU; this was yet another protected complaint.

58. Tammy LNU told Anderson to take responsibility for her mistakes, but Anderson was not aware of any mistakes she had made.

59. Everyone had been entirely pleased with Anderson's performance before McGahee was hired.

60. Tammy LNU accused Anderson of being inarticulate and unorganized, and said that Anderson "worked in circles."

61. Anderson was surprised by this and asked for additional training if she was not doing well.

62. Tammy LNU refused, saying Anderson had had enough training already.

63. Anderson pushed back, noting she was given approximately twenty minutes' worth of information before the project was dropped on her.

64. Tammy LNU then agreed to get Anderson more training.

65. The additional training started on or around about 10, 2022.

66. A few days later, Anderson spoke with HR representative Joshua Kuntz (Caucasian) via a Teams call.

67. Anderson reported the discrimination she felt and asked to be treated as an equal to her Caucasian colleagues – yet another protected complaint.

68. Anderson also mentioned she was not happy that she had never been told of her mistakes until a few days prior and that she was again wrongfully accused of being inarticulate.

69. On or about January 13, 2022, Anderson had what she thought was to be a one-on-one call with McGahee, but Kuntz was on the call as well.

70. McGahee then tore into Anderson, talking about how she was abysmal at her job.

71. Anderson again pushed back, noting she had only received the one day of training, not anywhere near what she had asked for, and that she had never been told of any performance issues until within the past two weeks.

72. McGahee then placed Anderson on a Performance Improvement Plan ("PIP"). This was an adverse action against Anderson.

73. Kuntz stated that this PIP was not disciplinary, but was meant to help Anderson improve. This statement ended up being false.

74. Anderson was off work on or about January 14, 2022.

75. Anderson's PIP officially began on or about January 17, 2022.

76. Anderson was supposed to be receiving additional training, but McGahee just told her to get her billing done by the afternoon meeting.

77. Although Anderson could not complete all of her tasks (she was waiting on some information from others before she could), she completed nearly all of them.

8

78. Anderson asked for feedback on the work, and McGahee only responded by asking Anderson how she felt she did.

79. On or about the 18th, McGahee again refused to actually provide additional training to Anderson.

80. Instead, McGahee just assigned Anderson more work.

81. On the 19th, McGahee told Anderson she wanted at least 35 completed accounts for the day.

82. Again, Anderson received no additional training, but still completed more than the required amount by the end of the day.

83. Also again, McGahee refused to provide feedback to And.

84. On or about January 20, 2022, Anderson met again with McGahee and Kuntz.

85. McGahee said that Anderson was refusing to improve and thus her employment was being terminated.

86. Anderson pushed back noting that, despite numerous requests over even just the past few days, McGahee refused to give her feedback on her tasks.

87. McGahee said she had sent emails on the issues to Anderson, but those emails were only instructions on what tasks to complete for the day. They were neither feedback nor additional training.

88. Shortly after her termination, Anderson learned that ProLink also fired Ray, one of the few other African American employees.

89. This termination of Anderson's employment constituted an adverse employment action.

90. The above facts demonstrate that ProLink engaged in a pattern and practice of race discrimination.

9

91. There was a causal connection between Anderson's race and ProLink's termination of Anderson.

92. ProLink's purported reason for Anderson's employment termination was pretextual.

93. ProLink actually terminated Anderson's employment in an act of race discrimination.

94. ProLink actually terminated Anderson's employment in an act of retaliation for her protected complaints of discrimination.

95. As a result of the above, Anderson has suffered and will continue to suffer damages.

## COUNT I: RACE DISCRIMINATION IN VIOLATION OF R.C. §4112 et seq.

96. Anderson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

97. Throughout her employment, Anderson was fully competent to perform her essential job duties.

98. Anderson is a member of a statutorily-protected class under R.C. § 4112.02(A).

99. ProLink employees treated Anderson differently than other similarly situated employees based on her race.

100. ProLink violated R.C. § 4112.02(A) et seq. by discriminating against Anderson due to her race.

101. On or about January 20, 2022, ProLink terminated Anderson without just cause.

102. Alternatively, Defendant's cited reason for Anderson's termination was pretext.

103. At all times material herein, similarly situated non-African American employees were not terminated without just cause.

104. Defendant terminated Anderson based on her race.

10

105. Anderson's race was a determinative factor in Defendant's decision to take adverse actions against Anderson.

106. Defendant violated R.C. § 4112.01 et. seq. when it terminated Anderson based on her race.

107. Anderson suffered emotional distress as a result of Defendant's conduct, and is entitled to emotional distress damages pursuant to R.C. § 4112.01 et seq.

108. As a direct and proximate result of Defendant's conduct, Anderson has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT II: RACE DISCRIMINATION IN VIOLATION OF TITLE VII

109. Anderson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

110. Throughout her employment, Anderson was fully competent to perform her essential job duties.

111. Anderson is a member of a statutorily-protected class under Title VII.

112. ProLink employees treated Anderson differently than other similarly situated employees based on her race.

113. ProLink violated Title VII by discriminating against Anderson due to her race.

114. On or about January 20, 2022, ProLink terminated Anderson without just cause.

115. Alternatively, Defendant's cited reason for Anderson's termination was pretext.

116. At all times material herein, similarly situated non-African American employees were not terminated without just cause.

117. Defendant terminated Anderson based on her race.

11

118. Anderson's race was a determinative factor in Defendant's decision to take adverse actions against Anderson.

119. Defendant violated Title VII when it terminated Anderson based on her race.

120. Anderson suffered emotional distress as a result of Defendant's conduct, and is entitled to emotional distress damages pursuant to Title VII.

121. As a direct and proximate result of Defendant's conduct, Anderson has suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

## COUNT III: RETALIATION

122. Anderson restates each and every prior paragraph of this complaint, as if it were fully restated herein.

123. During her employment with ProLink, Anderson made numerous reports and complaints regarding the racial discrimination she experienced at the hands of her coworkers and supervisors.

124. These were protected complaints.

125. The temporal proximity between Anderson's complaints and the unlawful termination of her employment shows that Anderson was actually fired in retaliation for making these protected complaints.

126. Defendant's actions were retaliatory in nature based on Anderson's complaints of racial discrimination.

127. As a direct and proximate result of Defendant's retaliatory discrimination against and termination of Anderson, she suffered and will continue to suffer damages, including economic, emotional distress and physical sickness damages.

**DEMAND FOR RELIEF**

WHEREFORE, Anderson demands from Defendant the following:

a) Issue a permanent injunction:

   i. Requiring Defendant to abolish discrimination, harassment, and retaliation;

   ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;

   iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

   iv. Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

   v. Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge her personnel file of all negative documentation;

c) An award against each Defendant for compensatory and monetary damages to compensate Anderson for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against each Defendant in an amount in excess of $25,000;

13

e) An award of reasonable attorneys' fees and non-taxable costs for Anderson's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ Matthew Bruce
Matthew G. Bruce (0083769)
 Trial Attorney
Evan R. McFarland (0096953)
**SPITZ, THE EMPLOYEES' LAW FIRM**
Spectrum Office Tower
11260 Chester Road, Suite 825
Cincinnati, Ohio 45246
Phone: (216) 291-0244
Fax: (216) 291-5744
Email: matthew.bruce@spitzlawfirm.com
Email: evan.mcfarland@spitzlawfirm.com

Attorneys for Plaintiff Lisa Anderson

## JURY DEMAND

Plaintiff Lisa Anderson demands a trial by jury by the maximum number of jurors permitted.

/s/ Matthew Bruce
Matthew G. Bruce (0083769)
    Trial Attorney
**SPITZ, THE EMPLOYEES' LAW FIRM**